CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
9/23/2026
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

STEPHANIE AUSTIN,

Plaintiff,

v.

DAVID STEINER, *Postmaster General, United States Postal Service, et al.*,

Defendants.

Case No. 4:25-cv-00030

**MEMORANDUM OPINION**

By: Hon. Thomas T. Cullen
United States District Judge

---

In September 2023, Plaintiff Stephanie Austin ("Austin") began working at the Gretna, Virginia post office as a Rural Carrier Associate for the United States Postal Service ("USPS"). Austin alleges that shortly after she started there, her boss, local postmaster Maynard "Sonny" Pruitt, subjected her to egregious sexual harassment and abuse. Specifically, Austin claims that, between September 2023 and April 2024, Pruitt made lewd, sexual comments in her presence, physically touched and groped her without her consent, and stalked her on her mail route.

When Austin first began working for the USPS in the Ringgold, Virginia office in October 2018, she attended orientation training on myriad topics running the gamut from ethical guidelines to worker safety and security. Her orientation packet also contained reproductions of two posters: Poster 72, which explains how an employee facing discrimination can initiate the Equal Employment Opportunity ("EEO") process, and Poster 159, which explains the rights of employees facing workplace harassment (although Austin does not recall having additional training on *reporting* harassment). In September 2023, Austin transferred to the Gretna post office. She alleges that Pruitt began harassing her soon

afterward. His last act of harassment occurred on March 30, 2024, when Pruitt confronted Austin while she was delivering mail on her route, told her that she needed to start answering his calls, and made sexually charged comments.

In April 2024, Austin reported Pruitt's abuse and harassment to Dwayne Griles, the president of the Virginia Rural Letter Carriers' Association, who directed her to John Adams, an executive committeeman with the National Rural Letter Carriers' Association. On May 1, Austin emailed a statement detailing her allegations against Pruitt to Adams. On May 8, Adams forwarded that statement to Michael Nelson, a USPS District Labor Relations Specialist, and Timothy Brust, a Labor Relations Manager for the USPS's Atlantic region.

The Labor Relations department immediately launched an investigation and interviewed Austin, Pruitt, other alleged victims, and witnesses. In July 2024, the Labor Relations investigators sent the report of their investigation to the District Manager of Labor Relations, Dean Mosteller, who ultimately substantiated Austin's allegations. Mosteller then instructed Pruitt's direct manager, Jim Hubbard, to conduct his own investigation based on the information from the Labor Relations report and decide whether corrective action was needed. Hubbard conducted his own interviews, including one with Austin, in September. Before that local investigation concluded, Pruitt retired.

On November 1, 2024, Austin filed a request for EEO counseling after she went to a federal injury center and her doctor asked if she filed an EEO request. The Equal Employment Opportunity Commissioner ("EEOC") subsequently reached out to the Labor Relations department for Austin's initial complaint and a copy of the investigation, which Mosteller provided. On November 8, the EEOC Compliance and Appeals office helped Labor Relations

close the case after receiving the results of this investigation. The EEOC never opened a new investigation.

In June 2025, Austin brought suit for sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, against Defendant David Steiner, the Postmaster General of the United States Postal Service ("Steiner"),[1] and the USPS. In December 2025, Steiner moved to dismiss Austin's complaint, arguing that she failed to exhaust her administrative remedies. The court converted Steiner's motion to dismiss into a motion for summary judgment and ordered limited discovery on the exhaustion issue. Following the close of discovery in August 2026, Steiner moved for summary judgment on the same basis: Austin's failure to seek EEO counseling within the requisite 45-day period. For the reasons discussed below, the court will deny Steiner's motion for summary judgment on this basis.

## I. FACTUAL BACKGROUND

The following facts are either undisputed or presented in the light most favorable to Austin, the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Henry v. Purnell*, 652 F.3d 524, 527 (4th Cir. 2011). They are primarily established through the deposition testimony of Stephanie Austin (*see generally* Austin Dep. I & II) and Michael Nelson (*see generally* Nelson Dep.), as well as numerous emails and other exhibits.

Austin started working for the USPS in 2018 at the Ringgold, Virginia office. (Austin Dep. I at 11:1–10.) As part of her initial training, Austin attended an orientation training in October 2018 and received a welcome guide with pertinent information about postal workers'

[1] Doug Tulino, the Acting Postmaster General at the time of the complaint's filing, was the initial defendant in this case. Because Steiner is the new Postmaster General, having replaced Tulino in July 2025, he is now the named defendant in this matter. *See* Fed. R. Civ. P. 25(d).

benefits, safety, ethical guidelines, direct deposit, security matters, and general background about the operation and organization of the USPS. (Austin Dep. II at 4:20–5:24; Pl. Ex. 37 [Welcome to the USPS Employee Quick Reference Guide].) The orientation packet also contained reproductions of two posters about reporting employment discrimination (Poster 72) and workplace harassment (Poster 159). (Pl. Ex. 37 at 68–69.) Poster 72, titled "Equal Opportunity is the Law," instructs USPS workers who "feel that [they] have been discriminated against because of race, color, religion, genetic information, national origin, sex, age (40+), physical or mental disability, or in retaliation for engaging in an EEO-protected activity" to consult an EEO counselor before filing a complaint of discrimination. (*Id.* at 68.) Poster 72 also made note of the requirement to request EEO counseling within 45 days of the date of the alleged discriminatory act; provided phone numbers; and detailed the steps to follow after an employee requests EEO counseling. (*Id.*) Poster 159, titled "Workplace Harassment: Know Your Rights! Take Responsibility!", described the obligations of USPS employees to report harassment and of managers to handle harassment complaints. (*Id.* at 69.) It also explained the different avenues for reporting harassment, listed the EEO complaint process as an additional form of relief, and provided brief instructions on how to pursue an EEO complaint. (*Id.*)

In September 2023, Austin transferred to the Gretna post office. (Griles Dep. at 31:6–9.) Shortly thereafter, Austin began experiencing persistent sexual harassment by Gretna's postmaster, Sonny Pruitt, which she contends continued through March 2024. (Austin Dep. I at 12:12–16.) Specifically, Austin alleges that Pruitt touched her inappropriately while she sorted the mail for her route in the office; called her repeatedly while she was on her route to

discuss his sexual encounters; and, on one occasion, followed her on her route to a remote area, where he made lewd comments, grabbed, and attempted to kiss her. (Pl. Ex. 7 [Email from Austin to John Adams].) She also alleges that, on March 30, Pruitt followed her a second time while she was on her route, told her that she needed to answer his calls, and asked her inappropriate questions. (*Id.*)

Around April 18, Austin reported the harassment to Dwayne Griles, the president of the Virginia Rural Letter Carriers' Association. (Griles Dep. at 8:17–19; 24:16–20.) Austin testified that she elected to go to the union because Pruitt had made statements that he was well-connected with the management and, accordingly, that she feared retaliation. (Austin Dep I. at 45:10–46: 2; Pl. Ex. 7.) Griles put Austin in touch with John Adams, an executive committeeman for the National Rural Letter Carriers' Association ("NRLCA"). (Griles Dep. at 17:11–16, Adams Dep. at 23:14–24:23.) Austin and Adams spoke on April 26, and he directed her to write down her allegations and send them to him via email, which she did on May 1, 2024. (Adams Dep. at 23:19–21, Pl. Ex. 7.)

On May 8, with Austin's permission, Adams forwarded Austin's email statement to Michael Nelson, a District Labor Relations Specialist, and Timothy Brust, the Labor Relations Manager for the Atlantic area/Eastern region. (Adams Dep. at 21:24–22:23; Nelson Dep. at 13:8–9, 24:12–23.) Brust managed the Labor Relations Specialists for the Atlantic area and reported directly to Jill Miniard, the Labor Relations Director for that region. *Rising to the top: Executive, manager news*, USPS Employee News (Apr. 27, 2021, at 9:28 a.m.),

https://news.usps.com/2021/04/27/rising-to-the-top-7/.[2] Nelson sent a separate email to Terriann Burke and Mary Ducey, Atlantic area Labor Relations Specialists, about the issues at Gretna and attached the statements Adams had received about Pruitt. (Pl. Ex. 13 [Email from Nelson to Burke and Ducey].) Shortly thereafter, Labor Relations started its investigation (called the Initial Management Inquiry Process, or "IMIP"), with Nelson interviewing Austin via phone on May 24, 2024. (Nelson Dep. at 72:22–25.) Nelson and another USPS investigator interviewed two other alleged victims in late May, and Nelson and Ducey interviewed a witness and second alleged victim in early June. (Pl. Ex. 2 [IMIP Report] at 6–9, 11–16.) Two other investigators interviewed Pruitt and a witness in July 2024. (*Id.* at 17–30.)

The IMIP was completed on July 19, 2024, and was forwarded to Miniard and Denise Cameron, the Manager of Human Resources for the Eastern area. (*Id.* at 1.) On July 26, Nelson sent the complete IMIP report to Dean Mosteller, the Labor Relations Manager for Virginia. (Pl. Ex. 17 [Email from Nelson to Mosteller]; Nelson Dep. at 119:22–24.) Mosteller's role was to determine whether, based on the information from the interviews conducted, Austin's allegations were substantiated, and if so, to direct Pruitt's manager to conduct his own investigation and take disciplinary action. (Nelson Dep. at 117:22–118:10.) Nelson re-sent the IMIP report to Mosteller on August 20, 2024, after Mosteller claimed that he never received it. (*Id.* at 121:21–123:17; Pl. Ex. 18 [Forwarded July 26 email from Nelson to Mosteller].)

On August 27, Mosteller reviewed the IMIP and substantiated Austin's claims against Pruitt. (Pl. Ex. 19 [Email from Mosteller to Nelson and Ducey]; Ex. 20 [Mosteller Memo].)

[2] In his deposition, Nelson testified that both Miniard and Brust were Labor Relations managers for the Atlantic area, and then he also explained that Brust reported to Miniard. To resolve this confusion, the court takes judicial notice of the USPS employee news website article that announced Miniard's promotion from the "Eastern Area's labor relations manager" to the "Atlantic Area's field labor relations director."

The next day, Mosteller forwarded the IMIP report to Jim Hubbard, Pruitt's direct manager, and asked him to conduct his own interviews. (Pl. Ex. 21 [Email from Mosteller to Hubbard].) When Hubbard asked why he had to repeat the interview process, Mosteller explained that local managers needed to investigate and decide what corrective measures should be taken, since the initial IMIP was only an inquiry into whether any alleged action constituted sexual harassment. (*Id.*) Hubbard reinterviewed Austin on September 13 (Austin Dep. II at 68:11–19), but on October 31, before the local investigation concluded, Pruitt suddenly retired. (Pl. Ex. 24 [Email from Mosteller to Susan Flanagan, Carlee Cash, David Plybon, Kim Streeety, Ducey, Burke, and Miniard].)

On November 1, Austin filed her request for EEO counseling. (Austin Dep. I at 12:20–22.) After the EEO received her complaint, David Plybon, the Manager of EEO Programs, asked Mosteller to put the IMIP into the Workplace Environment Tracking System ("WETS"), which he did on November 6. (Pl. Ex. 24 [Email from Plybon to Mosteller].) Then, the USPS attorney assigned to the case, Rebecca Simon-Pearson, reached out to Mosteller and asked if an IMIP had been conducted (Pl. Ex. 25 [Email from Simon-Pearson to Mosteller]). Simon-Pearson requested a copy of the investigation, and Mosteller provided it on November 7. (Pl. Ex. 28 [Emails between Mosteller and Simon-Pearson].) Finally, on November 8, a member of the EEO compliance team helped Mosteller close the case. (Pl. Ex. 29 [Email from Ibrahim Okatan to Burke and Mosteller, stating "Dean just closed the case. It's good to go."].) The EEO did not conduct its own investigation.

## II. PROCEDURAL HISTORY

Austin filed a formal EEO complaint on February 11, 2025, which the EEO dismissed as untimely. (Pl. Br. in Opp. Mot. Dismiss Ex. 3 [EEO Complaint], Ex. 4 [Dismissal of EEO Complaint].) The dismissal informed Austin that she had the right to file a civil action in the appropriate federal district court within 90 days of her receipt of the decision. (*Id.* Ex. 4.) In June 2025, Austin brought suit in this court for sexual harassment in violation of Title VII against Steiner and the USPS. (*See generally* Compl. [ECF No. 1]) She alleged that Pruitt's sexual harassment forced her to quit, causing damages such as loss of back pay, front pay, benefits, and bonuses, as well as mental pain and suffering. (*Id.* ¶¶ 15, 23.) She also alleged that that she met the administrative prerequisites to file an action under Title VII and had received a Notice of Right to File a Civil Action. (*Id.* ¶ 9.)

In December 2025, Steiner moved to dismiss Austin's complaint, arguing that she failed to exhaust her administrative remedies—specifically, that she did not seek EEO counseling within 45 days after the last alleged discriminatory act.[3] (Def. Br. in Supp. Mot. Dismiss at 3 [ECF No. 8].) Austin countered that, although she did not initiate contact with an EEO counselor, she timely contacted USPS personnel who are logically connected to the EEO process and, thus, otherwise satisfied the requirements of the regulation. (Pl. Br. in Opp. Mot. Dismiss at 7–8 [ECF No. 12].) Austin also argued that, in the alternative, she was entitled to equitable tolling because the USPS failed to provide notice to her of the 45-day requirement to contact an EEO counselor. (*Id.* at 8–9.) Because both parties supported their exhaustion

[3] Steiner initially argued that Austin's claim was untimely because "she failed to file her [c]omplaint within 90 days of her receipt of the final agency decision"; he withdrew that argument in his reply brief. (Def. Br. in Supp. Mot. Dismiss at 3; Def. Reply. Br. Mot. Dismiss at 1 n.1 [ECF No. 13].)

and tolling arguments with evidence extrinsic, the court converted Steiner's motion to dismiss into a motion for summary judgment and ordered limited discovery on the exhaustion issue. (Mem. Op. at 3–5 [ECF No. 14].) Following the close of discovery in August 2026, Steiner moved for summary judgment on the same basis as his motion to dismiss: Austin's failure to seek EEO counseling within the requisite 45-day period. The matter has been fully briefed and is therefore ripe for disposition.[4]

## III. Legal Standard

Under Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322 (quoting former Fed. R. Civ. P. 56(c)). Whether a fact is material depends on the relevant substantive law. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party carries its burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

---

[4] The court will also dispense with oral argument because it would not aid the decisional process.

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (cleaned up) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson*, 477 U.S. at 255. But the nonmoving party must "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

Even though summary judgment may be an appropriate tool to eliminate trial in some cases, it "must be used carefully so as not . . . to foreclose trial on genuinely disputed, material facts." *Thompson Everett, Inc. v. Nat'l Cable Advert., LP*, 57 F.3d 1317, 1323 (4th Cir. 1995). "The question at the summary judgment stage is not whether a jury is *sure* to find a verdict for the

plaintiff; the question is whether a reasonable jury could rationally so find." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 334 (4th Cir. 2011) (emphasis in original).

## IV. ANALYSIS

"Prior to instituting a Title VII action, aggrieved employees must first exhaust their administrative remedies." *Heaney v. Steiner*, No. 5:25-cv-00707, 2026 WL 1868207, at *4 (S.D.W. Va. June 29, 2026) (citing *Hoffman v. Inova Health Care Servs.*, 169 F.4th 207, 218 (4th Cir. 2026) & *Walton v. Harker*, 33 F.4th 165, 172 (4th Cir. 2022)). Federal employees who believe they are victims of sexual harassment must initiate contact with an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1). Although the regulation does not define the term "initiate contact"—and it appears that the Fourth Circuit has yet to address the issue—"the Equal Employment Opportunity Commission has consistently held that 'a complainant may satisfy the criterion of EEO Counselor contact by initiating contact with any agency official logically connected with the EEO process, even if that official is not an EEO Counselor, and by exhibiting an intent to begin the EEO process.'" *Culpepper v. Schafer*, 548 F.3d 1119, 1122 (8th Cir. 2008) (quoting E.E.O.C. Management Directive 110, at ch.2, § I.A, n.1 (Nov. 9, 1999)). "The EEOC's interpretation of § 1614.105(a) is relevant because an agency's interpretation of its own regulation is 'controlling unless plainly erroneous or inconsistent with the regulation.'" *Id.* (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (cleaned up))[5]; *see also Johnson v. Cohen*, 6

[5] In 2024, the Supreme Court abrogated so-called *Chevron* deference, which required courts to defer to an agency's reasonable interpretation of an ambiguous statute. *See Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 379–80 (2024). *Auer* deference, by contrast, requires court to defer to an agency's reasonable interpretation of its own ambiguous regulations. *See Kisor v. Wilkie*, 588 U.S. 558, 580 (2019). The Fourth Circuit has cautioned that *Loper Bright* "has called into question the viability of *Auer* deference." *United States v. Boler*, 115 F.4th 316,

F. App'x 308, 311 (6th Cir. 2001) (holding that the EEOC's interpretation of § 1614.105(a) was not plainly erroneous or inconsistent with the regulation); *Nygren v. Ashcroft*, 109 F. App'x 816, 819 (8th Cir. 2004) (per curiam) (same); *Klugel v. Small*, 519 F. Supp. 2d 66, 71 (D.D.C. 2007) (collecting cases where courts adopted the EEOC's interpretation of the phrase "initiate contact with a Counselor").

Austin avers that the last alleged act of harassment occurred on March 30, 2024. (Austin Dep. I at 12:17–19.)[6] Therefore, she had until May 14, 2024, to seek EEO counseling. Because Austin did not contact an EEO counselor until November 1, 2024 (*id.* at 12:20–22), the operative question is whether Austin contacted an agency official logically connected to the EEO process with the intent to commence the EEO process. Although Austin raised an equitable tolling argument in her response to Steiner's motion to dismiss, she is no longer seeking "equitable tolling or an extension under 29 C.F.R. § 1614.105(a)(2)" because in late May 2025, after the 45-day period expired, she "attended union-steward training whose written materials reference the 45-day requirement." (Pl. Br. in Opp. Mot. Summ. J. at 21 n.10 [ECF No. 23] (citing Austin Dep. II at 14:2–17, 16:2–20.1).)

**A. Logical Connection to the EEO Process**

Steiner first argues that Austin's contacts with union representatives Griles and Adams and USPS Labor Relations Specialist Michael Nelson within the 45-day window do not satisfy

---

322 n.4 (4th Cir. 2024). Nevertheless, even after *Loper Bright*, the Fourth Circuit treated *Auer* and *Kisor* as controlling in *Boler*, and insofar as this case turns on an agency's interpretation of its own regulation, this court will as well.

[6] Steiner "assumes without conceding that Austin is alleging a string of ongoing discrimination." (Def. Br. in Supp. Mot. Summ. J. at 13 n.8 [ECF No. 24].) *See Jakubiak v. Perry*, 101 F.3d 23, 26 (4th Cir. 1996) (noting that in cases alleging ongoing discrimination, the 45-day clock starts from the date of the last discriminatory act).

the exhaustion requirement because neither was logically connected to the EEO process. (Def. Br. in Supp. Mot. Summ. J. at 14–16.) Specifically, he points to the union representatives' deposition testimony that the union grievance process in the USPS is separate and distinct from the EEO process, and Nelson's deposition testimony that he did not handle EEO complaints as a Labor Relations Specialist. (*Id.* at 15 (citing Adams Dep. at 14.23–15.1; Nelson Dep. at 13:6–9, 108:23–109.1.) Austin, in turn, argues that, because an employee may use a proxy to contact the EEO or an official logically connected to the EEO process, Adams's forwarding of the email Austin sent him—wherein she documented, in graphic detail, the many instances of harassment she had experienced—to Labor Relations Manager Tim Brust on May 8 is a sufficient and timely contact.[7] (Pl. Br. in Opp. Mot. Summ. J. at 22 (citing Adams Dep. at 21:13–22:23; Pl. Ex. 9 (Adams forwarding Austin's email).) *See Sutton v. Rumsfeld*, 343 F.3d 948, 949–50 (8th Cir. 2003) (holding that complainant met the exhaustion requirement by contacting an EEO counselor *through his union representative*). She also contends that Brust is logically connected to the USPS's EEO process because of how the Labor Relations division falls within the agency's overall structure:

> The Postal Service's Employment and Labor Relations manual states that the "vice president for Labor Relations oversees the EEO complaint processing program . . . regarding complaints of discrimination." Ex. 46, USPS, Employee & Labor Relations Manual § 674 (Mar. 2024). Section 674.1 places the Chief Human Resources Officer in the role of the Postal Service's EEO

[7] Austin appears to concede that a union representative is not logically connected to the EEO process. In any case, the court agrees with Steiner that, in this specific instance, the evidence in the record shows that union representatives within NRLCA and its Virginia branch are not logically connected with the EEO process; both Griles and Adams emphatically represented that the union grievance and the EEO processes are completely separate (Griles Dep. at 17:20–18:12; Adams Dep. at 17:2–10), and Austin's steward training explained that "NRLCA stewards and representatives play no role in the filing and/or processing of EEO complaints" and that "NRLCA stewards and representatives are prohibited from acting as an employee's representative in an EEO complaint." (Def. Ex. 6 at 5.)

> Director under the EEOC's regulations. *Id.* § 674.1. It makes the vice presidents of Employee Resource Management and Labor Relations responsible for equal employment opportunity and for preventing discrimination. ELM 55, § 674.1. The Postal Service's organizational chart shows Labor Relations in the same chain as the Chief Human Resources Officer. Ex. 47, USPS Organizational Chart (2024). Nelson worked within that chain as an acting area Labor Relations specialist. He reported directly to Brust, the Manager of Labor Relations for the Atlantic Area. And Brust reported to Jill Miniard. The IMIP also reached Denise Cameron, who was a human resources manager for the Atlantic Area. Ex. 2 at 1. Thus, Austin's complaint began with Brust and reached the highest levels of the Postal Service's Labor Management and Human Resources departments.

(Pl. Br. in Opp. Mot. Summ. J. at 24–25 (footnote omitted).) Austin also included the following depiction of the Labor Relations chain-of-command within USPS's Human Resources department:




(*Id.* at 24, fig. 3.; *see also* Pl. Ex. 47 [USPS Organizational Chart showing that the VP of Labor Relations is in the same branch as Human Resources and two positions under the Chief Human Resources Officer].) After a thorough review of the record, the court finds that there

is a genuine dispute of material fact as to whether Austin initiated contact with an agency official logically connected to the EEO process with the intent to begin the EEO process within the 45-day window.

Courts have routinely characterized the EEOC's application of its "logically connected" interpretation as a pragmatic and endorsed it. For instance, the Ninth Circuit has explained that because the purpose of Title VII's exhaustion requirements is to provide agencies with an opportunity to settle employment discrimination disputes informally before resorting to the formal EEO complaint process, "it makes good sense to interpret 'contact with a Counselor' pragmatically to include contact with agency officials with . . . a connection to the counseling process, without attributing dispositive significance to the officials' job titles." *Kraus*, 572 F.3d at 1044 (quoting *Jasch v. Potter*, 302 F.3d 1092, 1094 (9th Cir. 2002)); *see also Beckford v. Esper*, No. 1:18-cv-1294, 2018 WL 11508931, at *5 (E.D. Va. Dec. 18, 2018) (noting that, although the Fourth Circuit has not crafted its own definition of "initiate contact with [an EEO] Counselor," other courts "have found the requirement to be satisfied where contact was initiated with a broad range of personnel who had some connection to the employment counseling process."). Courts have also warned against interpreting exhaustion requirements too mechanically so as not to impose an "unduly rigid or formalistic procedural hurdle on injured employees seeking redress." *Kraus*, 572 F.3d at 1045; *see also Klugel*, 519 F. Supp. 2d at 72.

Applying this pragmatic approach requires a fact-specific inquiry rather than blind adherence to categorical rules (*i.e.* that Labor Relations Specialists in *all* agencies and in *all*

circumstances are never logically connected to the EEO process).[8] "In fact, even contact with certain agency officials who are not EEO personnel has been held sufficient to satisfy the regulation's 'contact with a Counselor' requirement, provided they are found to be 'logically connected to the EEO process within the agency.*" Kraus*,572 F.3d at 1044–45 (citing *Duke v. Slater*, EEOC Doc. 01A02129, 2000 WL 732027, at *1 (E.E.O.C. May 22, 2000) (holding that the agency's Regional Director of the Office of Civil Rights was "clearly" logically connected to the EEO process)); *see also Buckli v. Caldera*, EEOC Doc. 05970223, 1998 WL 1944318, at *2 (E.E.O.C. Oct. 8, 1998) (holding that "in the case of sexual harassment, contact with a supervisory official, who was not an EEO Counselor, was sufficient to constitute EEO contact."). Moreover, the EEOC has recognized that even when there may be some question as to whether the official is logically connected with the EEO process, the initiation requirement can be satisfied where the "contact at least gave rise to a duty on the part of the agency to direct complainant to an EEO counselor within the limitation period." *Osuagwu v. Peake*, EEOC Doc. 0120081307, 2008 WL 2264405, at *1 (E.E.O.C. May 20, 2008) (citing *Lucy v. United States Postal Serv.*, EEOC Doc. 01962691, 1996 WL 688719, at *2 (E.E.O.C. Nov. 19, 1996); *Buckli*, 1998 WL 1944318, at *2 (holding that the complainant's "contact with agency

[8] The court has found a few unpublished, out-of-circuit cases where the courts applied a more rigid approach, holding that agency officers without "EEO" in their job titles are not logically connected to the EEO process. *See, e.g.*, *Williams v. McDonald*, No. 3:15-cv-01710, 2016 WL 868803, at *3 (D. Or. Mar. 6, 2016); *Gebhardt v. Chu*, No. C 10–2807, 2010 WL 5211459, at *9 (N.D. Cal. Dec. 16, 2010). Those cases are neither binding precedent nor persuasive authority. The court also concludes that their holdings do not align with the widely-recognized purpose of the exhaustion requirement under Title VII (to facilitate internal resolution of discrimination issues), the Fourth Circuit's caution against making the Title VII exhaustion requirement into a "tripwire for hapless plaintiffs" and "erecting insurmountable barriers to litigation[,]" *Sydnor v. Fairfax Cnty., Va.*, 681 F.3d 591, 594 (4th Cir. 2012), and the EEOC's own interpretation of its regulation and its pragmatic application of that interpretation.

officials regarding the alleged sexual harassment . . . was sufficient to constitute EEO contact since the agency was clearly on notice regarding her allegations.”).

As noted above, Austin first contacted union representative Griles about the alleged harassment around April 18, 2024. (Austin Dep. I at 39:11–16.) Griles contacted Adams, a NRLCA executive committeeman, about her complaint. (Griles Dep. at 24:12–15.) Adams then contacted Austin and requested a statement detailing her allegations against Pruitt. (Adams Dep. at 22:13–14.) After Adams received Austin’s detailed complaint, he forwarded it to Nelson and copied Brust. (Pl. Ex. 9; Adams Dep. at 22:14–23.) Nelson explained that, as a District Labor Relations Specialist, his primary job functions were to handle employee complaints and issues at the district level, which usually covered a set of offices in a state. (Nelson Dep. at 13:6–21.) He therefore reported to the Labor Relations Manager for his district, whose supervisor was the Human Resource manager. (*Id.* at 15:21–25; 26:5–6.) He also testified that Brust was a Labor Relations Manager for the Atlantic region who oversaw the Labor Relations Specialists for that area (*i.e.*, Brust and his team covered a larger geographic area than Nelson).[9] (*Id.* at 24:12–23, 25:13–22.) The area-level specialists resolve employee complaints when the district-level specialists cannot resolve them. (*Id.* at 26:20–25.) Brust, in turn, reported to Jill Miniard, the Labor Relations Director for the Atlantic area. It is unclear

[9] Nelson made several inconsistent statements in his deposition. For instance, he first stated that Brust was responsible for area representatives (also known as Level 23s) (Nelson Dep. at 24:17–21), but later said that “Mr. Brust is not responsible for the 23s.” (*Id.* at 28:11.) But based on Nelson’s testimony that he, as a district-level Labor Relations Specialist, did not report to Brust and that a Labor Relations Specialist working within the Atlantic area (which is broader than a district) (*see id.* at 25:13–22), the court will disregard his statement that Brust was not responsible for the Level 23s or the area-level Labor Relations Specialists. Additionally, Brust’s email signature provides that he is the “Manager, Labor Relations” for the “Atlantic Area/Eastern Region” (Pl. Ex. 10 (email from Brust to Nelson and Mary Ducey)), so it is a matter of common sense that he oversaw those who handled employee complaints at the broader area level.

from the record who Miniard's direct superior was, but Nelson confirmed that the Vice President of Labor Relations is one of her higher-level supervisors. (Nelson Dep. at 107:22–25.) Although Nelson averred that he had nothing to do with the EEO process (*id.* at 108:23–109:1), he conceded that Section 674 of the Employee and Labor Relations Manual provides, "The vice president of Labor Relations is responsible for the Postal Service EEO complaint processing program" and renders the "final agency decision of the Postal Service regarding complaints of discrimination emanating from employees or applicants for employment." (*Id.* at 109:11–112:19; Pl. Ex. 46.)

The investigation process following Austin's complaint further underscores the interplay between the Labor Relations department and the EEO. Shortly after Austin's emailed statement was forwarded to Nelson and Brust, Nelson emailed Mary Ducey and Terriann Burke, Atlantic area specialists who worked under Brust, about sexual harassment at the Gretna post office. (Pl. Ex. 13.) Ducey, in turn, contacted three other investigators to conduct interviews for the IMIP along with Nelson, who was conducting the bulk of the interviews. (Nelson Dep. at 41:20–42:7, 55:25–17; *see* Pl. Ex. 2.) Following their investigation, Nelson sent the IMIP to Mosteller, the District Manager of Labor Relations for Virginia, who determined, based on the interviews, that Austin's allegations were credible and turned the investigation over to Pruitt's manager. (*Id.* at 117:14–119:24.) When Austin filed her EEO request on November 1, 2024, the EEO sent an email to Mosteller telling him that the complaint warranted an IMIP. (Pl. Ex. 26.) Mosteller responded, informing the EEO that an investigation had already been conducted. (Pl. Ex. 24.) In response, a USPS attorney requested a copy of the IMIP and asked Mosteller, "Did we take statements from Austin and/or

potential witnesses?" (Pl. Ex. 28.) Mosteller sent over a copy of the investigation on November 7. (*Id.*) A day later, an EEO compliance and appeals-data analyst emailed the Labor Relations department that Mosteller closed the case and "it's good to go." (Pl. Ex. 29.)

This rapid progression from Austin's EEO filing to her case being closed indicates that the EEO did not conduct its own investigation. Instead, multiple USPS personnel who worked within its EEO requested that an IMIP to be conducted and asked to review those investigative findings, demonstrating that the EEO relied on the Labor Relations investigators' findings. At bottom, both the EEO's reliance on that investigation as well as USPS's organizational structure would allow a reasonable jury to conclude that Austin timely notified officials logically connected to the EEO process.

Moreover, the fact that Austin failed to contact Brust directly does is not dispositive of this issue *See Sutton*, 343 F.3d at 949–50. When Adams forwarded Austin's statement—which provided graphic details of the alleged harassment and abuse USPS concluded that she had suffered at the hands of her supervisor—to Nelson and Brust so that Labor Relations could investigate her complaint, the USPS was indisputably put on notice of her allegations. The email also triggered an internal-investigation process, the primary goal of the Title VII exhaustion requirement. *See Kraus*, 572 F.3d at 1044 (stating that the purpose of Title VII's exhaustion requirement is to provide agencies with the opportunity to resolve employment discrimination disputes through informal processes first).[10]

---

[10] Steiner attempts to bolster his argument that Labor Specialists at the USPS are not logically connected with the EEO process by citing several cases (Def. Br. in Supp. Mot. Summ. J. at 15–16), all of which either fail to pragmatically apply the EEOC's interpretation of "initiate contact" or are otherwise distinguishable from the facts elucidated by the record here. In *Brooks v. DeJoy*, the court simply held that the plaintiff did not fulfill the exhaustion requirement because the Labor Relations Specialist was not an EEO counselor and did not even mention the fact that an employee can satisfy the exhaustion requirement by contacting an agency official

### B. Intent to Begin the EEO Process

Steiner also argues that the record is devoid of evidence suggesting that Austin intended to begin the EEO process when she spoke with Nelson and her union representatives, because she did discuss the EEO process with either of them. (Def. Br. in Supp. Mot. Summ. J. at 16–17.) He further contends that Austin's eventual contact with an EEO counselor on November 1, 2024, undermines her later claim that she intended to initiate the EEO process in May because if she believed she had already met her EEO counseling requirement, "she would have no reason to have then done so" in November. (*Id.* at 17.)

Austin counters that she did not need to "utter magic words to demonstrate intent to begin the EEO process[,]" and that the court must instead look to her "conduct to determine whether [she] exhibited an intent to begin the process the agency provides for discrimination complaints." (Pl. Br. in Opp. Mot. Summ. J. at 27–28.) Austin notes that her written complaint "went into graphic sexual detail and asked the Postal Service to stop Pruitt." (*Id.* at 31 (citing Pl. Ex. 7 [Austin's email to Adams]).) She points out that, immediately following the submission of her written statement, the USPS quickly acted to assemble investigators and interview witnesses and ultimately released a report substantiating her allegations, and that her participation in this protracted investigative process evinces the requisite intent. (*Id.* at 30.)

---

logically connected to the EEO process (and, therefore, conducted no analysis on whether the Labor Relations Specialist was logically connected). No. 21-CV-0024, 2021 WL 6091848, at *4 (N.D. Okla. Dec. 23, 2021). Similarly, in *DiPaulo v. Potter*, the court held that the Workplace Enforcement Analyst who plaintiff contacted was not logically connected to the EEO process because he was not an EEO counselor and did not work in the USPS's EEO office, conducting no fact-specific analysis on the nature of that official's work and his interaction with the plaintiff's complaint and the investigation process. 733 F. Supp. 2d 666, 672 (M.D.N.C. 2010). Finally, the officials in *Murphree v. Commissioner* and *Kirkland v. Mabus* were either the plaintiffs' direct supervisors or administrative officials who had many duties in the agency, including having a general duty to respond to and address employee concerns. 644 F. App'x 962, 965–66 (11th Cir. 2016) (officials contacted were plaintiff's supervisors); 206 F. Supp. 3d 1073, 1080–81 (E.D. Va. 2016) (officials were a chaplain and the Inspector General).

Finally, she distinguishes her situation from cases where plaintiffs were found to not have intended to begin the EEO process—specifically, where they were advised of the EEO process and expressly declined to pursue it. (*Id.* at 28–30 (citing *Cook v. McHugh*, 193 F. Supp. 2d 866, 869 (M.D. Tenn. 2016); *Marcos v. Navy*, No. 22-00418, 2025 WL 2219944, at *1–2 (D. Haw. Feb. 19, 2025).) She argues that because she was never properly advised on the EEO counseling requirement by either the officials she spoke to or during training, the court should not hold her failure to invoke EEO terminology against her. The court agrees with Austin that a genuine dispute of material fact exists as to whether she manifested intent to begin the EEO process.

"Courts have . . . interpreted broadly the requirement that the complainant exhibit an intent to begin the EEO process, finding it to be satisfied where the complainant merely expresses a desire to pursue a discrimination complaint." *Beckford*, 2018 WL 11508931, at *5 (holding that the plaintiff's expression of a desire to pursue a discrimination complaint and active participation in the subsequent investigation satisfied the intent requirement) (citing *Culpepper*, 548 F.3d at 1120–21). For example, one court found that the plaintiff's conversation about his sexual harassment claim with a supervisor, "coupled with [the supervisor's assurance that he would look into the matter and get back to [the plaintiff], sufficiently demonstrate[d] that [the plaintiff] exhibited an intent to begin the EEO process." *Robinson v. Napolitano*, No. 08–4804, 2010 WL 358469, at *7 (D.S.D. Jan. 26, 2010) (citing *Buckli*, 1998 WL 1944318, at *2). Another court has recognized that a plaintiff meeting with her supervisors on the same day as the last discriminatory event; contacting the Postal Police, an official at the crisis prevention division, and therapists at the Employee Assistance Program (EAP) within a week;

and filing a grievance with her union steward "put the Postal Service on notice of plaintiff's allegations of sexual harassment . . . [and] indicated plaintiff's intent to pursue the EEO process." *Briggs v. Henderson*, 34 F. Supp. 2d 785, 788 (1999).

But other courts have held that employees do not manifest intent to begin the EEO process where the letter sent to the official "does not discuss what happened to plaintiffs personally . . . or evidence any discernable intent on plaintiffs' part to pursue the administrative process." *Fuller v. Johnson*, 107 F. Supp. 3d 1161, 1168 (W.D. Wash. 2015); *see also Nygren*, 109 F. App'x at 819 (holding that the plaintiff's statements to officials "indicate[d] that she was not interested in pursuing the matter unless" the harasser's conduct resumed); *Welsh v. Hagler*, 83 F. Supp. 3d 212, 221 (D.D.C. 2015) ("In the January 10 e-mail regarding the first incident, Welsh merely describes the events that transpired. He does not reference the EEO process or ask the recipients to take any action at all. He also did not follow up when Montgomery instructed the security managers to address the situation, suggesting that Welch did not intend on pursuing the matter further."). Additionally, when an agency official contacted by an affected employee instructs her to contact an EEO counselor, the plaintiff's failure to follow up with the counselor "ultimately shows a lack of intent to file an EEO complaint." *Williams v. McDonald*, No. 3:15-cv-01710, 2016 WL 868803, at *3 (D. Or. Mar. 6, 2016). But the converse is also true: when the officer fails to advise the affected employee of the EEO contact requirement, the plaintiff's failure to seek timely counseling does not necessarily evince a lack of intent to begin the EEO process. *See Briggs*, 34 F. Supp. 2d at 788 (declining to find a lack of exhaustion where the officials did not advise plaintiff that she needed to contact an EEO counselor within 45 days to ensure she preserved her claim); *Guerra v. Runyon*, EEOC Doc.

01944190, 1994 WL 744965, at *2 (E.E.O.C. Nov. 9, 1994) ("Although the agency officials contacted were not technically EEO counselors, the agency should have responded to appellant's contact by advising her exactly who to contact with her allegations of discrimination.").

Austin further challenges the veracity of the USPS Learning Management System ("LMS") transcript (which tracks the training USPS employees receive [Kyer Dep. I at 35:2–37:12]). Steiner relies, in part, on this transcript to argue that she had requisite notice of the EEO requirement, and thus that her failure to seek EEO counseling initially conclusively establishes a lack of intent to do so. The transcript, which can be edited manually and backdated by the person that led the training (Kyer Dep. I at 40:23–41:2, 41:14–22), contains entries showing that Austin completed training on the No FEAR Act[11] on days where she contends that she was not at work (because she was at her other job),[12] as well as entries of trainings from 2025, when Austin was on leave. (Pl. Br. in Opp. Mot. Summ. J. at 25–26 n.13 (citing Pl. Ex. 41, 43; Austin Dep. II at 40:2–22, 41:21–43:2, 51:24–53:15, 53:21–54:14).) In fact, a Rule 30(b)(6) deponent for USPS, Jeffrey Kyer, testified that other than the trainer entering the credit into the LMS system, there is no other information that USPS has to support the transcript entries that purport to establish when an employee completed training

---

[11] The Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002 ("No FEAR Act"), 5 U.S.C. §§ 2301 *et seq.*, prohibits discrimination against federal employees based on race, religion, age, sex, and other characteristics and assigns responsibilities to agencies. 5 U.S.C. §§ 2302(b)(1), (c)(2)–(5).

[12] Austin contends that she knows that she was not at work for one of the days she supposedly completed a No FEAR Act training (May 20, 2022) because she kept an appointment book that tracked the days that she was at the Gretna post office and the days that she was not. (Austin Dep II. At 53:9–15.) Though Austin's appointment book is not one of the exhibits provided to the court, it will nonetheless draw reasonable inferences in her favor as the nonmoving party.

(Kyer Dep. I at 41:23–42:2). The employees are not required to sign in to trainings, nor are trainers required to contemporaneously enter training credit into the LMS system. (Kyer Dep. I at 40:23–41:19.) Because there is simply no way for the court to confirm that the transcript entries are accurate (and, in fact, their accuracy is contradicted by competent and admissible evidence), it will disregard the LMS transcript as evidence that Austin received some sort of training that would have informed her of the need to specifically state that she intended to begin the EEO process.

Austin also points to testimony from former coworkers that the USPS's training materials "fail to inform them of the risks of not contacting the EEO within 45 days of the last discriminatory act." (*Id.*) For instance, Carol Noren attended the Welcome to the USPS training in Roanoke, Virginia, in October 2018—the same orientation training Austin went to. (Noren Dec. ¶ 4.) She testified that the orientation felt rushed; that she did not recall hearing any information about contacting an EEO counselor within 45 days of a discriminatory act, the EEO process in general, or the No FEAR Act; and that she did not know that a USPS employee who was sexually harassed must contact an EEO counselor within 45 days or that failure to contact an EEO counselor forfeits an employee's right to recover damages. (*Id.* ¶¶ 6–16.) Likewise, Eric Allen, a fellow rural carrier associate at the Gretna post office, testified that he did not recall when he saw the EEO poster (Poster 72) displayed on the bulletin board at Gretna, though he confirmed that he recalled seeing it at some point (Allen Dep. at 36:8–37:13); that he did not remember if Austin was at a sexual harassment training (nor if there was any other sexual harassment training) (*id.* at 39:12–16); that he did not receive the Employees Guide to Understanding, Preventing, and Reporting Harassment (*id.* at 40:23–

41:3); and that he did not know how long he would have to contact an EEO counselor in the case of harassment, hostile work environment, and discrimination (*id.* at 47:9–16). Another 30(b)(6) deponent for the USPS, Dwight Plybon, confirmed that Poster 72 does not explain the risks of not contacting an EEO counselor within 45 days. (Plybon Dep. at 90:2–22.) Finally, both parties provided the orientation materials that Austin received (and kept thereafter in her home), which included a copy of Poster 159 (titled "Workplace Harassment: Know Your Rights! Take Responsibility!") (Def. Ex. 3, Pl. Ex. 37 at 69), although Austin testified that she did not remember reading through the booklet. (Austin Dep. II at 9:9–12:20.)

In any event, courts have held that, when the complaint involves sexual harassment, employees are not automatically deemed to be on notice when the posters displayed, or the information they receive during training, do not inform them that sexual harassment constitutes employment discrimination, or that employees who experienced harassment in the workplace must contact an EEO counselor. For instance, in *Jense v. Runyon*, a district court held that the EEO poster displayed in the office failed to satisfy the regulation requiring information about the EEO time limits and requirement to contact a counselor before filing a complaint, 29 C.F.R. § 1614.102(b)(7), because it did not explain that "sexual harassment is a form of employment discrimination." 990 F. Supp. 1320, 1326 (D. Utah 1998). The court reasoned that:

> A person untrained in the law could not reasonably be expected to know that sexual harassment constitutes employment discrimination on the basis of sex. Such an employee, as Jense herself claims to have done, could reasonably have interpreted the process outlined in the poster to apply only to discriminatory acts like being denied a promotion or pay raise because of one's gender. The regulation requires that employees be informed "of the variety of equal employment opportunity programs and

> administrative and judicial remedial programs available to them." The Equal Employment Opportunity poster failed to notify employees that the process was to be utilized to advance claims of sexual harassment.

*Id.* That court also addressed the defendant's argument that the plaintiff "was alerted to the presence of the posters during an employment orientation session[,]" noting that the orientation presenter testified at her deposition that "she only instructed employees to look for the Equal Employment Opportunity poster if they were subjected to discrimination" and that "she did not make any specific reference to the procedures to be followed in the event of sexual harassment." *Id.* The court therefore concluded that, "[b]ecause her presentation did not include any explanation of what constituted employment discrimination under Title VII, her presentation failed to provide Jense notice of the deadline for the same reason that the Equal Employment Opportunity poster itself failed to do so." *Id.* The court also noted that the posters on display appeared to provide "a variety of avenues through which an employee may seek relief in addition to the EEO process, and, in this case, [it] may have been affirmatively misleading." *Id.* Finally, to the extent that the plaintiff attended an office meeting, or "standup talk," the court found that the evidence conflicted as to the topics discussed, with the plaintiff testifying that she did not remember sexual harassment being mentioned at all. *Id.*

Similarly, in *Burke v. DeJoy*, the court addressed the same two posters that Steiner contends Austin saw, either on the bulletin board or in her orientation materials: Poster 72 (the EEO poster) and Poster 159 (the harassment poster). *See* No. 22-CV-34, 2025 WL 1626313, at *12–13 (W.D.N.Y. Feb. 6, 2025), *report and recommendation adopted by* 2025 WL 1465982 (W.D.N.Y. May 22, 2025). The court held that the inconsistencies in the plaintiff's and the supervisor's testimony regarding whether those posters were prominently displayed in

the office "establish an issue of fact precluding summary judgment" regarding whether the plaintiff had notice of the need to contact an EEO counselor within 45 days of experiencing sexual harassment. *Id.* at *12. The court also found that it was not clear from Poster 159 that "employees who are subject to harassment in the workplace must contact an EEO counselor[.]" *Id.* at *13. The court explained:

> [R]ather, Poster 159 provides that an employee who desires to pursue an EEO complaint must contact "the *EEO Centralized Intake Center* by calling toll free . . . ." Poster 159 (italics added). The court observes that Poster 159's direction that an employee contact "their immediate supervisory or manager," or "any supervisory or manager," could have caused Plaintiff to believe that by complaining to Sinnott and Tino, Plaintiff had timely reported the harassment. Poster 159 is also unclear as to what is accomplished by contacting the EEO Centralized Intake Center "within 45 days of the act or acts giving rise to the claim to preserve your rights under federal law . . . ." These words can be construed as implying that the filing of an EEO complaint would occur as soon as the employee contacted the EEO Centralized Intake Center, when in reality, a complaint would not be filed until the parties engaged in an informal attempt to resolve the employee's claims of workplace harassment.

*Id.*

The court recognizes that the courts in *Jense* and *Burke* were analyzing the separate issue of whether the plaintiffs were entitled to equitable tolling based on lack of notice, an argument that Austin has abandoned. Nevertheless, because Steiner appears to argue that Austin had to state specifically that she wanted to initiate the EEO process to demonstrate the requisite intent, the court finds *Jense* and *Burke* instructive as to the dispositive question here: whether Austin demonstrated, through her words and conduct, that she intended to begin the EEO process *within the 45-day timeframe*. (*See* Pl. Surreply at 7 n.4 ("The steward training came too

late to bear on intent. . . . What Austin learned in late May cannot recharacterize what she intended and did in early May.")

There are also genuine disputes of material fact as to whether, between March 30 and May 14, 2024, Austin knew she had to invoke "EEO" when she emailed her statement to Nelson. First, as noted above, Austin disputes that she was at work on the days the LMS transcript indicated that she participated in training on the No FEAR Act. Moreover, she points out that a supervisor (or whoever conducted the training) had the ability to manually edit the transcript and backdate it. The court thus does not accept the transcript entries as definitive proof of Austin's participation in those trainings and thus her knowledge of the preferred procedure.

Additionally, the two posters were either displayed or reprinted in the orientation packet suffer the same deficiencies identified by the *Jense* and *Burke* courts. Poster 72 does not explain that sexual harassment is a form of discrimination and that an employee experiencing harassment must contact an EEO counselor. Poster 159 (which does *not* appear to have been displayed on the bulletin board at the Gretna office (see Pl. Ex. 30) likewise fails to connect sexual harassment to discrimination. Although the poster explains that the EEO complaint process is a form of additional relief and that an employee must contact the "EEO Centralized Intake Center . . . within 45 days of the act or acts that give rise to the claim to preserve [his or her] rights under federal law[,]" the court finds this language misleading for the same reasons cited in *Jense* and *Burke*. Poster 159 appears to present the EEO complaint process as one of two paths for obtaining relief (in addition to the union grievance procedure) without discussing the distinctions between them. The poster also explains that an employee

experiencing harassment should notify a supervisor, the HR manager, or a union representative, and places the EEO process under the "Additional Relief" heading, indicating that it is a viable alternative, but that all roads lead to the same process.

Finally, the union representatives testified that they did not discuss the EEO process with Austin, inform her about the 45-day deadline, or direct her to an EEO counselor. (Austin Dep. I at 29:9–16; Griles Dep. at 25:12–19; Adams Dep at 17:19–18:10, 21:16–22:5.) In addition, although Nelson testified that he advised Austin of her EEO rights in his May 24, 2024 conversation with her, he did not attach that notice to his notes regarding that conversation or otherwise document that he made that statement to Austin. (Nelson Dep. at 97:12–98:16.) Austin and the union representatives also dispute whether they assured her that they would handle her complaint and that they would ensure that the appropriate process was commenced for resolving her claims. (*See* Austin Dep. I at 34:25–37:19; Griles Dep. at 24:23–26:11; Adams Dep. at 25:24–26:21.)

At bottom, this case is materially distinct from those where an agency official directed the affected employee to contact an EEO counselor, or where the employee knew that her complaint required her to initiate the EEO process to obtain relief, but she expressly declined to do so. It is also a far cry from cases where intent could not reasonably be inferred from the plaintiff's equivocal statements or conduct that she wanted the agency to take official action. Austin's initial statement described Pruitt's harassing comments, groping, stalking, and threats in graphic detail and stated that she hoped that "this can be resolved and we don't have to work in this kind of environment anymore." (Pl. Ex. 7 [Austin's email].) And in her conversations with Nelson and the union representatives, Austin reiterated that she wanted

Pruitt removed from his position and expressed that "the Postal Service needed to know . . . what Sonny Pruit had done to me." (Austin Dep. I. at 33:4–5; *see also* Adams Dep. at 21:18–22, 27:18–20 ("She asked me to make sure that [Pruitt] never returned to the office, and that it was put in the hands of somebody above the district level.").) Her allegations were also repeatedly referred to as a "complaint." (*See* Adams Dep. at 28:15–20.) Finally, Austin fully participated in the formal inquiry launched by the Labor Relations department (*see* Pl. Ex. 2 [IMIP]) and Hubbard's investigation. (Austin Dep. I at 20:12–21:2.) Although Austin never used the "magic words," there is sufficient evidence in the record giving rise to a reasonable inference that she wanted to initiate a formal process to remedy the harassment she experienced. The record, in other words, is replete with disputed facts underlying the question of whether Austin intended to initiate the EEO process when she reported her supervisor's sexual harassment. A reasonable jury reviewing this record could safely conclude that she did.

## V. CONCLUSION

For the reasons discussed above, Steiner's motion for summary judgment will be denied.

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 23rd day of September, 2026.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE